UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DATHAN PRICE,

               Petitioner,

                                          CASE NO. 06-CV-12758
v.                                      HONORABLE GERALD E. ROSEN

KENNETH MCKEE,

               Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
## AND DENYING A CERTIFICATE OF APPEALABILITY
## AND LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

**I.**     **Introduction**

      Dathan Price ("Petitioner"), a Michigan prisoner, has filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254 challenging his convictions for first-degree felony murder,

Mich. Comp. L. § 750.316, and possession of a firearm during the commission of a felony, Mich.

Comp. L. § 750.227b, which were imposed following a jury trial in the Wayne County Circuit

Court.  Petitioner was sentenced to life imprisonment without the possibility of parole on the

murder conviction and a consecutive term of two years imprisonment on the felony firearm

conviction in 2002.

      In his pleadings, Petitioner raises claims concerning illegal arrest, improper admission of

evidence, prosecutorial misconduct, improper jury instructions, the failure to produce a witness,

and cumulative error.  For the reasons stated, the petition for writ of habeas corpus is denied.

Additionally, a certificate of appealability and leave to proceed *in forma pauperis* on appeal are

also denied.

## II.     Facts and Procedural History

Petitioner's convictions stem from the armed robbery and shooting death of Theodore

Wright, Jr. in Detroit, Michigan on April 1, 2002.  Petitioner was tried by separate jury in a joint

trial with co-defendants Katherine Wright and Jawan Hayes.  The prosecution's theory was that

Katherine Wright, the victim's estranged wife, recruited Jawan Hayes to assault her husband and

that Hayes and Petitioner ambushed the victim in Katherine Wright's backyard, shot and robbed

him, and fled in his car.  The defense claimed that Petitioner did not know that Hayes intended to

rob the victim until shortly before they arrived at the house and that Petitioner did not have the

requisite intent to murder.

On direct appeal to the Michigan Court of Appeals, defense counsel summarized the

relevant facts as follows:

**Motions**

Prior to trial, the defense moved to quash the Information. (6/14 Hrg 18-37). Also,
through June 21, July 12, and July 15, 2002, an evidentiary hearing was held on a
motion by Price challenging the legality of his arrest. On July 15, 2002, the trial
court dismissed a first degree murder charge pending against Price for lack of
evidence.  (7/15 EH 198-205). On July 24, 2002, the trial court denied the
challenge to his arrest. (7/24 Hrg. 20-27).

After trial began, the prosecution endorsed Daniel Bizovi, a 'jailhouse lawyer' to
whom Price allegedly spoke. (TT 8/14 102). Also, the prosecution was granted
permission to use statements a Carnell Hayes made to police pursuant to an
investigative subpoena. (TT 8/12 5-11; TT 8/14 4-7). Finally, the trial court ruled
that the Price jury would be allowed to hear evidence that his co-Defendants
intended to commit a first degree murder. (TT 8/13 9-10).

The prosecution had endorsed Quatella Williams, an eleven-year-old cousin of
Mrs. Wright. (Hereinafter simply called "Wright" or "Mrs. Wright"). Quatella
Williams observed the shooting of Mr. Wright from a house next-door. (TT 8/13
37-39, 72-73). The defense told the judge and jury that Quatella Williams was an

essential witness. (TT 8/12 206; TT 8/14 14). The prosecution, however, never produced Quatella Williams. (TT 8/15 6-7).

**Trial Evidence**

At the time of the homicide, the Wrights were married. According to Mr. Wright's family and friends, the two had been living apart for about two years. (TT 8/12 49, 199). Mr. Wright had a $52,500 life insurance policy naming Mrs. Wright beneficiary. He told friends that he was going to make the beneficiary his children. (TT 8/14 76, 82). During March of 2002, he gave Mrs. Wright until April 1st to decide whether she wished to remain married, or else he would file for divorce. (8/14 72, 85-86). Mrs. Wright told a friend that she was tired of the fighting and arguing in the marriage. (8/13 199).

<u>The Richards</u>

During January 2002, Paris and Wallace Richards were, respectively, speaking on cell phones to co-defendants Wright and Hayes. According to Wallace, Paris handed her phone to him, saying Mrs. Wright wished to talk. Wright then asked Wallace whether he knew anyone who would beat-up her husband. Wallace thought it was a joke. Hayes, still on the other cell phone with Wallace, asked why Wallace was laughing. Wallace repeated what Wright had stated. Hayes in turn responded by laughing, and stating: "I'll whup a nigga." In March 2002, Wright called Wallace and asked: "Where yo' boy at?" (8/13 182-188).

<u>The Evening of the Homicide</u>

Latonya Wright was Mr. Wright's sister. On April 1, 2002, around 10:00 PM, Mr. Wright received a telephone call prompting him to take milk or juice to his baby at Mrs. Wright's home on Burns Street in Detroit. (TT 8/14 89-92). Police later found Mr. Wright face down, in Mrs. Wright's backyard, with multiple bullet wounds to his back. (TT 8/13 19, 59). An autopsy found that six gunshot wounds and one shotgun wound caused Mr. Wright's death. The wounds were inflicted within four to six feet. (TT 8/13 154, 161-164). Police recovered one spent bullet jacket. (TT 8/13 89, 92). Towels were found on the ground, and a nearby barbeque pit had been overturned. (TT 8/13 87, 90, 107).

Mrs. Wright told police that Mr. Wright had come to her house; that the two were giving their baby a bath; that she asked Mr. Wright to get something from a car they shared; that Mr. Wright went into the backyard; that she then heard gun shots; and the perpetrators fled in the automobile shared by the Wrights. Mrs. Wright told police that she surmised it was a carjacking. According to police, Mrs. Wright was visibly upset. (TT 8/13 23, 29, 60-63).

That same evening, Wright gave police a written statement. Here, police describe her demeanor as "extremely calm." In this statement, Wright relates the same facts as above, and that she had heard Mr. Wright say "whoa" before she heard five gun shots; that she screamed and ran to the window with her grandmother; that she observed two people in the backyard drive off in her car; that she called police; that she could not describe the two people; that Mr. Wright had recently been involved in a fight with his barber; and that she and Mr. Wright had been separated since April 2001. (TT 8/15 79-81).

Police Investigation

On April 2, 2002, Mrs. Wright went to Mr. Wright's employer and made inquiries regarding his insurance. She told them she needed the money to pay for his funeral. She was told there was a process to follow. (TT 8/15 23-26). That same afternoon, Wright went to her husband's residence in order to get burial clothes. According to sister, Mrs. Wright retrieved Mr. Wright's suit, jewelry, pain medication, papers, car keys, wallet and movies. She was described as being in a happy mood. (TT 8/14 94-97, 100).

Police found Mr. Wright's car, a gold Pontiac Grand Am, "engulfed in flames," near a playground at Fairport and Greiner streets in Detroit. (TT 8/13 53, 84). Two days later, police arrested Defendant Price at a home on Fairport Street, in the same neighborhood where said Grand Am was located. (TT 8/13 63-68, 75).

Police learned from neighbors that one of the perpetrators was a 20 to 30 year-old black male, about 5'11" in height, wearing a dark baseball cap and dark clothes, and weighing about 170 pounds. (TT 8/13 28, 37, 72). Neighbors told police that the other perpetrator was a 20 to 30 year-old black female, about 5'5" in height. (TT 8/13 29,37,74).

Neighbors told police that the perpetrators arrived in a car still parked six or seven houses from the crime scene. Police examined the car. Its doors had been "punched," and its keys were still in the ignition. Inside, police found a cell phone, a walkie-talkie, shattered glass, a pair of gym shoes and black boots, and two coats. (See TT 8/13 26, 48, 83, 87, 98; TT 8/15 13-18). The car was registered to co-defendant Hayes. (TT 8/13 31-32).

Carnell Hayes

Carnell Hayes was a twenty-four-year-old cousin of co-defendant Hayes. They both lived on Montclair Street. (TT 8/14 20). At trial, Carnell testified that he did not know the co-defendants Wright and Price well, but did know Price by the nickname "Cash." (TT 8/14 21). Upon learning that co-defendant Hayes owned the car found near the crime scene, police went to his registered address. There

they found and took into custody Carnell. (TT 8/13 34).

At trial, Carnell testified that his memory of the police interrogations was very poor. (TT 8/14 24, 28, 30, 38). Over defense objection, Carnell was made to read to the jury his April 2, 2002, signed statement. (TT 8/14 41, 51). Therein, Carnell states that he saw Hayes around 9:00-10:00 PM on the night in question. Hayes did not state his car was missing. Hayes was with "a skinny brother." (TT 8/14 46). Hayes owned a silver .44 caliber gun and a 12-gauge shotgun. The thin man was acting nervous. (TT 8/14 49-52). Hayes told Carnell to take the guns; then near midnight called and said a man in a black Chevy truck was coming by for the guns. A "skinny dude" thereafter took possession of the guns (TT 8/14 55-56). Carnell testified that he had only signed the statement in order to go home. Carnell's mother was his legal guardian. (TT 8/14 57-69).

Hayes Reports Car Stolen

On April 2, 2002, co-defendant Hayes reported his car was stolen (the 1986 blue Pontiac found near the crime scene). Hayes told police that, the day before, he had left his keys in that car while he went into a party store. He told police that the car was gone when he came out. (TT 8/13 139). Police told Hayes to come in and sign a property release form. When he arrived, however, he was told that police insisted on talking to him. (TT 8/13 35, 40).

Montclair Street Address

On April 3, 2002, police went to the Hayes' residence on Montclair Street. There police retrieved the sawed-off 12-gauge shotgun used in this homicide, seven live 12-gauge rounds, and a spent casing. (TT 8/15 52-55). The spent casing was inside the shotgun and the seven live rounds were in the magazine (TT 8/15 64). Police found other rounds in a bedroom. (TT 8/15 64, 66).

Statement of Price

Outside the presence of the other jury, an officer testified regarding statements taken from Price on April 3, 2002. Regarding the first, Price denied that he shot and killed anyone in the backyard of Wright's house. Rather, Price witnessed Hayes do the shooting: "I knew he was going to hit a lick but I did not know that Jawan has (sic) going to shoot him." Hayes did not even tell Price that he was going to 'hit a lick' (do a robbery) until the two were near Wright's house. (TT 8/15 158).

According to the officer, Price stated that, in the Wright's driveway, he obeyed Hayes' instruction to hand him a shotgun from under a back seat. Once in the backyard, a man came from the Wrights' house. Hayes told the man to lay on the

ground and toss out his keys. The man complied. Hayes then shot him. Price witnessed one shot and heard at least six more. Hayes used the shot gun, but also possessed a .44 caliber handgun. Price did not know the man whom Hayes shot. (TT 8/15 159). He knew nothing of Hayes' plan, but was simply following Hayes' lead. (TT 8/15 161).

After Hayes finished, Price was scared and went with him in the man's car. Hayes drove. Price received nothing for being with Hayes. During the ride, he asked Hayes why he did it: "Because I thought he was just going to get the man's wallet. Jawan said it ain't like that. I'm about to get some major money." They drove to a house about two miles away. Hayes took the guns inside, returned within minutes, and then took Price home. Price states he did not know how the car was set afire. (TT 8/15 160-162). Price again stated that he did not know that the shooting was going to occur, and that he never expected to be paid anything. (TT 8/15 164).

According to the officer, Price initiated a second interview in which he states that he recalled further details, including: "the fact that Jawan was supposed to get $5,000 Dollars for doing the hit. And we arrived – and when we arrived at the scene, Jawan called the girl and told her that he was outside." Hayes told him about the five thousand dollar payment as he was taking Price home from the shooting. (TT 8/15 166-167).

Daniel Bizovi

Bizovi was characterized by the prosecution as a "jailhouse lawyer." He resided in a cell next to Price at the Wayne County Jail. He claimed that the two forged a "jailhouse friendship" shortly after he arrived on Price's unit, and Price asked him for legal advice. He testified before both juries regarding statements purportedly made to him by Price. (TT 8/14 107-108).

Bizovi's description of Price's account generally mirrors the account provided through the police witness regarding Price's interrogation. The exception being that, according to Bizovi, Price claimed to have been brought into the plan to rob and beat Mr. Wright, but then panicked and shot Mr. Wright, as Mr. Wright was getting the better of Hayes in his resistance of the robbery:

> The original plan that Dathan was aware what was gonna take place was to simply assault the man and beat him up because Katherine Wright had been allegedly beat up by her husband and she wanted him to feel what it was like to be beat on. And she wanted to observe the situation happen. So they gonna make it look like an armed robbery and a beating at the same time. [TT 8/14 110-111].

6

Cause Mr. Dathan Price at first was only aware that there was
simply going to be a beating and a robbery taking place and that
was through the conversations with [Jawan Hayes]. [TT 8/14
117-118].

According to Bizovi, Price was to be paid $500.00 for his participation. Outside
the Wrights' house, Price became concerned that neighbors observed them
circling the block. He told Hayes he wanted to back out. Hayes refused. (TT 8/14
112, 117). Once at the Wrights' home, Hayes tells Price to hold onto a shotgun in
case of 'trouble.' According to Bizovi, Price states that, in the backyard, Mr.
Wright and Hayes fought. Hayes was losing. According to Bizovi, Price states
that he panicked and shot Wright in his back once. The two then flee in Mr.
Wright's car, with Price driving. (TT 8/14 119-122). According to Bizovi, Price
claimed he later torched Wright's car, because he had prior experience doing so in
another "insurance job." (TT 8/14 124, 142).

According to Bizovi, Price's purported revelations came about over several nights
conversation at the jail. Bizovi was a white male, whom the black male Price did
not know prior to these conversation. (TT 8/14 147, 167). Bizovi conceded that he
reached out to police. (TT 8/14 148). Bizovi was facing two counts of Armed
Robbery, and he leveraged his testimony to obtain a charge and sentence
agreement. He was facing life as an habitual offender, and instead received a
sentence agreement of 6-15 years. He had five prior theft or dishonesty related
convictions on his record. (TT 8/14 150-155, 206, 214).

Defendant's Brief on Appeal, pp. 1-10.

At the close of trial, the jury convicted Petitioner of felony murder, armed robbery, and

possession of a firearm during the commission of a felony. The trial court subsequently

sentenced him to life imprisonment without the possibility of parole on the murder conviction, a

concurrent term of 15-25 years imprisonment on the armed robbery conviction, and a

consecutive term of two years imprisonment on the felony firearm conviction.

Following sentencing, Petitioner filed an appeal as of right with the Michigan Court of

Appeals asserting several claims, including the claims contained in the present petition. The

Michigan Court of Appeals vacated his armed robbery conviction on double jeopardy grounds,

but affirmed his felony murder and felony firearm convictions. *People v. Price*, No. 246013,

2004 WL 2119686 (Mich. Ct. App. Sept. 23, 2004) (unpublished). Petitioner filed an

application for leave to appeal with the Michigan Supreme Court, which was denied. *People v.*

*Price*, 472 Mich. 938, 698 N.W.2d 397 (2005).

Petitioner thereafter filed the present petition asserting the following claims as grounds

for habeas relief:

I.      His arrest on less than probable cause violated the Fourth Amendment to
        the United States Constitution.

II.     He was denied federal due process when the state court allowed his jury to
        hear a large amount of highly prejudicial evidence relevant to the co-
        defendant's plan to murder but irrelevant as to Petitioner.

III.    He was denied his state and federal due process right to a fair trial through
        prosecutorial misconduct, including improper denigration of the defense
        and defendant, appeal to the peace and safety of the community, and
        sympathy for the victim.

IV.     He was denied due process when the state court diminished the
        prosecution's burden of proving the element of intent for felony murder
        beyond a reasonable doubt and denied Petitioner a fair trial by giving
        inadequate instructions on aiding and abetting and malice.

V.      He was denied due process when the prosecution failed to produce
        Quatella Williams and when trial counsel failed to request the missing
        witness instruction.

VI.     The cumulative effect of the errors committed at trial deprived him of a
        fair trial.

Respondent has filed an answer to the petition, asserting that it should be denied because the

claims are not cognizable, barred by procedural default, and/or lack merit.

## III.    **Standard of Review**

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his

habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336

(1997).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

    "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule

that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a result different from [this] precedent.'"  *Mitchell v. Esparza*, 540 U.S.

12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see

also Bell v. Cone*, 535 U.S. 685, 694 (2002).  "[T]he 'unreasonable application' prong of §

2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the

correct governing legal principle from [the Supreme] Court but unreasonably applies that

principle to the facts' of petitioner's case."  *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)

(quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.  However, "[i]n order for a

federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the

state court's decision must have been more than incorrect or erroneous.  The state court's

application must have been 'objectively unreasonable.'"  *Wiggins*, 539 U.S. at 520-21 (citations

omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, this Court presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**IV.** **Analysis**

A.    Illegal Arrest Claim

Petitioner first asserts that he is entitled to habeas relief because the police lacked probable cause for his arrest and, as a result, the trial court erred in denying his motion to suppress his police statements. Respondent contends that this claim is not cognizable upon federal habeas review.

Federal courts will not address a Fourth Amendment claim upon habeas review if the

petitioner had a full and fair opportunity to litigate the claim in state court and the presentation

of the claim was not thwarted by any failure of the state's corrective processes. *Stone v. Powell*,

428 U.S. 465, 494-95 (1976). A court must perform two distinct inquiries when determining

whether a petitioner may raise a claim of illegal arrest in a habeas action. First, the "court must

determine whether the state procedural mechanism, in the abstract, presents the opportunity to

raise a fourth amendment claim. Second, the court must determine whether presentation of the

claim was in fact frustrated because of a failure of that mechanism." *Machacek v. Hofbauer*,

213 F.3d 947, 952 (6th Cir. 2000) (quoting *Riley v. Gray*, 674 F.2d 522 (6th Cir. 1982)).

     Michigan has a procedural mechanism which presents an adequate opportunity for a

criminal defendant to raise a Fourth Amendment claim. *See, e.g., People v. Ferguson*, 376

Mich. 90, 93-94 (1965) (motion to suppress), *People v. Harris*, 95 Mich. App. 507, 509 (1980).

Petitioner has not shown that a failure of that procedural mechanism prevented him from

litigating his claim. The record reveals that Petitioner challenged the legality of his arrest prior

to trial. The trial court denied the motion to suppress. Petitioner again raised the issue on direct

appeal. The Michigan Court of Appeals conducted a review of the Fourth Amendment issue

and concluded that Petitioner was not entitled to relief on his claim. *See Price*, 2004 WL

2119686 at *6.

     Given this record, it is clear that the Michigan courts were cognizant of Petitioner's

Fourth Amendment issue and that he received all the process he was due. While Petitioner

challenges the state courts' decisions, he has not shown that the procedures were flawed such

that he was unable to properly litigate the issue. Petitioner had a full and fair opportunity to

litigate his Fourth Amendment claim. Accordingly, his illegal arrest claim is not cognizable on

federal habeas review pursuant to *Stone v. Powell*.  Habeas relief is not warranted on this claim.

      B.     <u>Evidentiary Claim</u>

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in admitting evidence of Katherine Wright's motive for the crime.  Such evidence included the victim's intent to divorce co-defendant Wright and remove her as his life insurance beneficiary, as well as co-defendant Wright's actions in collecting the victim's valuables and trying to obtain his life insurance proceeds after the murder.  Petitioner claims that such evidence was irrelevant to his case because he was charged with felony murder.  Respondent contends that this claim lacks merit.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and warrant habeas relief.  *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The Michigan Court of Appeals concluded that the motive evidence was properly admitted as to Petitioner as a matter of state evidentiary law, stating in relevant part:

> Defendant Price was only charged with first-degree felony murder, along with armed robbery and felony-firearm. There was no question of premeditation. Further, there was no evidence that defendant Price knew the victim or his plans to either divorce defendant Wright or change his life insurance beneficiary designations. However, informant Bizovi testified that defendant Price informed him that he was going to be paid approximately $500 "out of some insurance money" for assisting defendant Hayes and that defendant Hayes would be paid, in part, out of insurance proceeds. Because defendant Price's method of payment concerned insurance proceeds, it was arguably relevant for the jury to hear testimony regarding the underlying insurance policy and matters affecting the

policy. Even with felony murder, malice must be shown, which can be established, in part, through evidence that the defendant either had an intent to kill or to inflict great bodily harm. *People v. Aaron*, 409 Mich 672, 733, 299 NW2d 304 (1980). Accordingly, the jury certainly would have been interested in defendant Price's motive to do harm to the victim, and considering the testimony of Bizovi indicating that defendant Price knew that he would be paid for his actions out of insurance money, evidence touching on insurance would be relevant. Further, the probative value of the evidence was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" MRE 403. Under these circumstances, we cannot conclude that the trial court abused its discretion in allowing defendant Price's jury to hear this evidence. Moreover, considering the weight and strength of the untainted evidence against defendant Price, particularly Bizovi's testimony, defendant Price has not shown that it is more probable than not that a different outcome would have resulted even assuming error.

*See Price*, 2004 WL 2119686 at *7.

To the extent that Petitioner asserts that the state courts erred in applying Michigan evidentiary law, he is not entitled to relief from this Court. The Michigan Court of Appeals' determination that the trial court's admission of evidence was proper under state law will not be second-guessed upon habeas review. State courts are the final arbiters of state law and federal habeas courts will not intervene in such matters. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987).

Because the Michigan Court of Appeals did not address whether the alleged error constituted a denial of Petitioner's federal constitutional rights, the deference due under 28 U.S.C. § 2254(d) does not apply, and habeas review of the claim is *de novo*. *See Higgins v. Renico*, 470 F.3d 624, 630 (6th Cir. 2006) (quoting *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003), and citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). Having undertaken the requisite review, the Court concludes that the trial court did not violate Petitioner's constitutional rights by admitting the motive evidence. Such evidence was relevant for

establishing Petitioner's intent and for providing the jury with a complete picture of events. Its admission did not render the trial fundamentally unfair.

Additionally, even if the trial court erred in admitting the evidence, such error was harmless. For purposes of federal habeas review, a constitutional error that implicates trial procedures is considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also O'Neal v. McAninch*, 513 U.S. 432, 445 (1995) (habeas court should grant petition if it has "grave doubt" about whether trial error had substantial and injurious effect or influence upon jury's verdict). Given the significant evidence of Petitioner's guilt presented at trial, including his own police statements and Daniel Bizovi's testimony, any error in admitting the motive evidence did not have a substantial and injurious effect or influence on the jury's verdict. Habeas relief is not warranted on this claim.

C.    Prosecutorial Misconduct Claims

Petitioner asserts that he is entitled to habeas relief because the prosecution engaged in misconduct by denigrating the defense, appealing to community safety, and seeking sympathy for the victim. Respondent contends that the first two instances of alleged misconduct lack merit and that the third is barred by procedural default and does not warrant habeas relief.

To prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The United States Court of Appeals for the Sixth Circuit has adopted a two-part test for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v.*

14

*Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing cases). First, the court must determine whether the challenged statements were indeed improper. *Id*. at 452. Upon a finding of impropriety, the court must decide whether the statements were flagrant. *Id.* Flagrancy is determined by an examination of four factors: 1) whether the statements tended to mislead the jury or prejudice the accused; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused. *Id*.

Petitioner asserts that the prosecutor denigrated the defense by asking Petitioner if he thought witness Daniel Bizovi's testimony was funny during the course of Bizovi's examination. Defense counsel objected to the remark and the trial court sustained the objection. It is clearly inappropriate for a prosecutor to make personal attacks on a defendant or defense counsel. *See, e.g., United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996). The Michigan Court of Appeals denied relief on this claim finding that while the prosecutor's remark was "intemperate," any prejudice to Petitioner was cured when the trial court sustained defense counsel's objection to the remark and instructed the jury that counsel's comments were not evidence. *See Price*, 2004 WL 2119686 at *8. Having reviewed the record, this Court agrees. While the prosecutor's comment was improper and deliberate, it was isolated in nature, did not mislead the jury about the case, and was not prejudicial given the trial court's curative actions and the strength of the evidence establishing Petitioner's guilt. Petitioner has not shown that this comment deprived him of a fundamentally fair trial.

Petitioner next asserts that the prosecutor improperly referred to an unrelated police officer's death when questioning a police witness. A prosecutor may not make remarks

"calculated to incite the passions and prejudices of the jurors." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). The Michigan Court of Appeals denied relief on this claim, stating that "the error was cured when the trial court immediately sustained defense counsel's objection to the reference" and instructed the jurors not to let sympathy or prejudice influence their decision. *Price*, 2004 WL 2119686 at *9. This decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The Court of Appeals was reasonable in finding that the prosecutor's reference did not prejudice Petitioner nor render his trial fundamentally unfair due to the trial court's corrective measures. Further, as discussed *supra*, the prosecution presented significant evidence of Petitioner's guilt at trial. Habeas relief is not warranted.

Lastly, Petitioner asserts that the prosecutor improperly invoked sympathy for the victim by commenting on the victim's family and children and making references to 9/11 attacks during closing arguments. Respondent contends that this claim is barred by procedural default due to Petitioner's failure to object at trial. This Court agrees. Habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72 (1977); *Couch v. Jabe*, 951 F.2d 94 (6th Cir. 1991). In *Wainwright*, the United States Supreme Court explained that a petitioner's procedural default in the state courts will preclude federal habeas review if the last state court rendering a judgment in the case rested its judgment on the procedural default. 433 U.S. at 85.

In such a case, a federal court must determine not only whether a petitioner has failed to comply with state procedures, but also whether the state court relied on the procedural default or, alternatively, chose to waive the procedural bar. "A procedural default does not bar

consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last *explained* state court judgment should be used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion. *Id*.

Here, the Michigan Court of Appeals rendered the last reasoned opinion. In dismissing this prosecutorial misconduct claim, the court relied upon a state procedural bar – Petitioner's failure to object to the alleged improper remarks at trial. *See Price*, 2004 WL 2119686 at *8-9. The failure to make a contemporaneous objection is a recognized and firmly-established independent and adequate state law ground for refusing to review trial errors. *See People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999); *People v. Stanaway*, 446 Mich. 643, 687, 521 N.W.2d 557 (1994); *see also Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Moreover, a state court does not waive a procedural default by looking beyond the default to determine if there are circumstances warranting review on the merits. *See Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989). Plain error review does not constitute a waiver of state procedural default rules. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). Nor does a state court fail to sufficiently rely upon a procedural default by ruling on the merits in the alternative. *See McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). The Michigan Court of Appeals denied this claim based upon the failure to object at trial.

A state prisoner who fails to comply with a state's procedural rules waives the right to

federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 753; *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). Petitioner neither alleges nor establishes cause to excuse his default. The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Nonetheless, the Court finds that Petitioner has failed to establish prejudice as he has failed to show that the comments made to his jury were improper or so flagrant as to result in a denial of due process. *See* discussion *supra*; *Donnelly*, 416 U.S. at 643; *Macias*, 291 F.3d at 452. Petitioner has not shown that the prosecution's remarks deprived him of a fundamentally fair trial.

Lastly, Petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo,* 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. His prosecutorial misconduct claims are thus barred by procedural default and/or lack merit, and do not warrant habeas relief.

D.    Jury Instruction Claims

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in instructing the jury on aiding and abetting and the intent (malice) necessary to support his felony murder conviction.  Respondent contends that this claim is barred by procedural default because Petitioner did not object to the challenged instructions at trial.

As noted, federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules.  *See Wainwright*, 433 U.S. at 85-87; *Coleman*, 244 F.3d at 539.  A procedural default bars consideration of a federal claim on habeas review if the last state court rendering a judgment in the case rests its judgment on a state procedural bar.  *See Harris*, 489 U.S. at 263-64; *see also Ylst*, 501 U.S. at 803-05.  The Michigan Court of Appeals denied relief on this claim based upon Petitioner's failure to object the disputed instructions at trial.  *See Price*, 2004 WL 2119686 at *9.

Petitioner neither alleges nor establishes cause to excuse this default.  He also cannot establish prejudice as this claim lacks merit.  In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly.  *See Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999).  A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial court record.  *See Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996).  State law instructional errors rarely form the

basis for federal habeas corpus relief. *Estelle*, 502 U.S. at 71-72.

Petitioner has not shown that the trial court's instructions on aiding and abetting or felony murder were erroneous under state law or that those instructions rendered his trial fundamentally unfair. As explained by the Michigan Court of Appeals on plain error review, the record indicates that the trial court instructed the jurors that they had to find that Petitioner acted with sufficient malice to convict him of felony murder and that they could not sustain such a conviction based upon a finding that he only intended to commit armed robbery. *See Price*, 2004 WL 2119686 at *9. The Court's review of the record reveals that the trial court gave standard instructions on aiding and abetting and the elements of felony murder, including the requisite intent to support such a conviction. *See* 8/16/02 Trial Tr., pp. 95-96, 98-99. Petitioner's jury instruction claim thus lacks merit. Further, as discussed *supra*, Petitioner has not established that a miscarriage of justice has occurred. His jury instruction claim is thus barred by procedural default, lacks merit, and does not warrant habeas relief.

      E.      <u>Missing Witness Claim</u>

In his petition for a writ of habeas corpus, Petitioner asserts that he is entitled to habeas relief because the prosecution failed to produce *res gestae* witness Quatella Williams and defense counsel failed to request the missing witness instruction. In his memorandum of law in support of the petition, however, Petitioner states that he waives this claim. Accordingly, the Court need not address the issue and habeas relief is not warranted on this claim.

      F.      <u>Cumulative Error Claim</u>

Lastly, Petitioner asserts that he is entitled to habeas relief based upon the cumulative effect of the alleged errors at trial. Respondent contends that this claim lacks merit. The

Michigan Court of Appeals denied relief on this issue finding that while some errors occurred, their cumulative effect did not deny Petitioner and the other defendants a fair trial. *See Price*, 2004 WL 2119686 at *12. This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. Given the Court's determination that Petitioner's claims lack merit, he cannot establish that habeas relief is warranted based upon cumulative error. Further, the United States Court of Appeals for the Sixth Circuit noted that the United States Supreme Court "has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002). Habeas relief is not warranted.

**V.**     **Conclusion**

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims in his petition and that the petition for a writ of habeas corpus must be denied.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard,

the court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id*. at 336-37.

When a federal district court denies a habeas claim on procedural grounds without addressing the claim's merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484-85.

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to each of his claims and has failed to show that reasonable jurists would debate whether the Court was correct in its procedural ruling as to his defaulted claims. A certificate of appealability is not warranted. The Court further concludes that Petitioner should not be granted leave to proceed *in forma pauperis* on appeal as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

Accordingly;

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability and leave to proceed *in forma pauperis* on appeal are **DENIED**.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated: May 2, 2008

I hereby certify that a copy of the foregoing document was served upon Dathan Price and counsel of record on May 2, 2008, by electronic and/or ordinary mail.
s/LaShawn R. Saulsberry
Case Manager